[892 NYS2d 738]

In the Matter of Jermaine H., a Child Found to be Neglected. Lisa H., Respondent.

Family Court, Monroe County, November 25, 2009

## APPEARANCES OF COUNSEL

*Kristen F. Splain, Conflict Defender (Kevin M. Khuns* of counsel), for respondent. *Nicole Bayly-Henshaw* for Department of Human Services. *Kimberly Weisbeck* for the child.

## OPINION OF THE COURT

PATRICIA E. GALLAHER, J.

What is at stake here is money, i.e., whether the Monroe County Department of Human Services (DHS) must pay foster care money for "emergency kinship foster care" to the friend of the family it has chosen and approved to care for the subject child in this neglect proceeding and who is willing to be a foster parent, just as if she were a stranger certified to provide foster care to this same child.

The primary issue before the court is *whether the Monroe County Department of Human Services can be required by the court pursuant to section 1017 of the Family Court Act and its relevant regulations to certify emergency kinship foster care homes* (18 NYCRR 443.7) and therefore pay foster care payments to such emergency kinship foster care parents without the care provider having completed the 10-week Model Approach to Partnerships in Parenting (MAPP) training course which Monroe County makes available from time to time and which the county requires before foster care payments are made.

The second issue is *whether, in the case at bar, the court can direct that Monroe County DHS certify as an "emergency kinship foster care" provider Loretta K.*, the woman in this case whom DHS has obviously found qualified to become a foster parent as it is allowing her to take care of the subject child in this case.

The third issue is *whether DHS can be ordered to pay foster care funds to Loretta K., the care provider*, both retroactively and so long as the child stays in the emergency kinship foster care home.

The court answers all three questions in the affirmative.

## The Time Line

On July 8, 2008, DHS filed a petition alleging that Jermaine H. (date of birth June 23, 2008) was a child neglected by re-

spondent Lisa H. (hereinafter mother). On November 17, 2008, the mother consented to the entry of a neglect finding against her, and the child was continued in the home of the mother while she made progress on the terms of the consent dispositional plan.

On September 11, 2009, DHS filed an order to show cause, asking that the child be placed in a nonrelative resource's home under the supervision of DHS. The resource is Loretta K. Although Ms. K. herself shares no blood relationship with Jermaine, Ms. K. has Family Court Act article 6 custody of Cherokee and Khadija H., two half-siblings of Jermaine H., the child involved in this case. Ms. K. is the paternal aunt of Khadija H. Jermaine was moved to the home of Ms. K. and his half-siblings on September 9, 2009, and has resided there ever since. All parties acknowledge this is a good home for Jermaine.

On September 28, 2009, the attorney for the child filed a notice of motion, asking that the court direct DHS to designate Ms. K. a kinship foster care parent, and that the child thereafter be deemed in kinship foster care. On October 2, 2009, counsel for DHS filed an affirmation in opposition to the motion. Counsel for the mother took no position and submitted no written response.

## Arguments of Counsel

The attorney for the child emphasizes how much Ms. K. needs more financial assistance than she is currently getting without standard foster care payments in order to be able to provide reasonably for Jermaine. According to the child's attorney, Ms. K. is interested in becoming a certified foster care parent. Significantly, when asked in court, she indicated she would not mind getting the money, but she did not have time for the classes because she has other children. It is clear from her statement in court, and the County's position, that she believes the only way for her to get routine foster care payments is to complete the 10-week MAPP course offered by DHS—the course for which she has no time due to caring for children, at least three of whom are not hers.

At the October 30, 2009 court appearance, the attorney for the County indicated the 10-week MAPP program would not be offered again until January, when it will be offered on some yet-to-be-determined weekday. She also indicated the traditional Saturday MAPP program which is occasionally offered is usually given in the summer.

The child's attorney details some of the expenses Ms. K. has undertaken for Jermaine since the child was placed with her. She submits that Ms. K. has received little if any assistance for the child's food and diapers, and has been paying out of her own pocket for the child's care, including buying him new clothes. She notes Ms. K. gets no assistance for day care for this toddler and does not receive food stamps. Within days of his placement with her she had to take him to the emergency department, but did not have a Medicaid card for this. The attorney for the child attached to her moving papers a listing of regular *foster care* payments and other expenses that are paid by Monroe County DHS to *certified foster care parents*, including mileage for appointments, school supplies, diapers and day care costs—in addition to the monthly fee of at least $474. (The monthly fee depends on the age and special needs of the child.)

The child's attorney identified various Family Court Act provisions and New York regulations applicable to these facts and circumstances (Family Ct Act §§ 1055-b, 1017, 255, 1015-a, 1028-a; 18 NYCRR 443.1, 443.7). The key statute is section 1017 of the Family Court Act, which states in its relevant parts:

> "1. In any proceeding under this article, *when the court determines that a child must be removed from his or her home,* pursuant to part two of this article, or placed, pursuant to section one thousand fifty-five of this article, *the court shall direct the local commissioner of social services to conduct an immediate investigation to locate any non-respondent parent of the child and any relatives of the child,* including all of the child's grandparents, all suitable relatives identified by any respondent parent or any non-respondent parent and any relative identified by a child over the age of five as a relative who plays or has played a significant positive role in his or her life, and inform them of the pendency of the proceeding and of the opportunity for becoming foster parents or for seeking custody or care of the child, and that the child may be adopted by foster parents if attempts at reunification with the birth parent are not required or are unsuccessful. The local commissioner of social services shall record the results of such investigation, including, but not limited to, the name, last known address, social security number, employer's address and any other identifying information to the extent known regarding any

non-respondent parent, in the uniform case record maintained pursuant to section four hundred nine-f of the social services law. For the purpose of this section, 'non-respondent parent' shall include a person entitled to notice of the pendency of the proceeding and of the right to intervene as an interested party pursuant to subdivision (d) of section one thousand thirty-five of this article, and a non-custodial parent entitled to notice and the right to enforce visitation rights pursuant to subdivision (e) of section one thousand thirty-five of this article. *The court shall determine:*

*"(a) whether there is a suitable non-respondent parent or other person related to the child with whom such child may appropriately reside;* and

"(b) in the case of a relative, whether such relative seeks approval as a foster parent pursuant to the social services law for the purposes of providing care for such child, or wishes to provide free care and custody for the child during the pendency of any orders pursuant to this article.

*"2. The court shall, upon receipt of the report of the investigation ordered pursuant to subdivision one of this section:*

*"(a) where the court determines that the child may reside with a suitable non-respondent parent or other relative or other suitable person, either:*

"(i) grant an order of custody or guardianship to such non-respondent parent, other relative or other suitable person pursuant to section one thousand fifty-five-b of this article; or

"(ii) place the child directly in the custody of such non-respondent parent, other relative or other suitable person pursuant to this article during the pendency of the proceeding or until further order of the court, whichever is earlier and conduct such other and further investigations as the court deems necessary; or

"(iii) remand or *place the child, as applicable, with the local commissioner of social services and direct such commissioner to have the child reside with such relative or other suitable person and further direct such commissioner pursuant to regulations of the office of children and family services, to commence an investigation of the home of such relative or other*

*suitable person within twenty-four hours and there-after approve such relative or other suitable person, if qualified, as a foster parent. If such home is found to be unqualified for approval, the local commis-sioner shall report such fact to the court forthwith.*" (Emphasis supplied.)

Counsel for the child argues that this law, together with Family Court Act § 1055-b and the applicable regulations, give the court the power to order the commissioner to place a child in emergency kinship foster care with foster care funds.

Counsel for the child specifically argues that Ms. K. falls under the definition of the emergency kinship foster care regulations as a suitable nonrelative with a "significant prior relationship with the child's family" and thus is qualified to be certified as an emergency kinship foster home (18 NYCRR 443.1 [h]). This is factually undisputed. If certified, Ms. K. would of course be entitled to foster care funds just like any stranger who could be providing care to the subject child if Ms. K. were not willing and available.

Counsel for the child also makes an argument under the constitutional Equal Protection Clause. However, this court need not reach that argument as the application of the regulations and statutes to the actions of DHS can resolve the pending application for relief in favor of the position of the child's attorney—and thus in favor of the child.

Counsel for DHS argues that DHS did all it was required to do by moving on an expedited basis in finding a non-foster-care placement for Jermaine. Counsel submits that "FCA § 1017 (2) (iii) only requires that an investigation of a proposed suitable resource commence within 24 hours and, *if qualified,* [Monroe County DHS would] make a foster care placement." (Emphasis supplied.) She argues further as follows, "Qualifications for becoming a foster parent are contained in 18 NYCRR 443.7. These applicable regulations do not require any county to certify relatives on an expedited basis, although a county *may* choose to do so." (Emphasis supplied.) She concludes, "Thus, as no statute or regulations requires the certification of so called 'emergency kinship foster homes' the Court lacks the authority to direct MCDHS to direct the certification of such," citing *Matter of Tymell* (275 AD2d 327 [2d Dept 2000]). This court disagrees on all three points.

## Discussion

Counsel states that the emergency foster care certification regulations do not *require* each county to comply with the regulations, and that individual counties may "opt out" of the regulations. This court disagrees. This court agrees with counsel for DHS that any assessment of a person for foster care designation, whether a relative or nonrelative, should be a thoughtful and deliberate examination, though the court disagrees that all persons indicating a desire to be certified as a foster care parent are required to undergo and complete training entitled Model Approach to Partnerships in Parenting.* Monroe County DHS has established the local MAPP training option as a 10-week course, though there are other training modalities available for the exact same curriculum, offered through the New York State Office of Children and Family Services (hereinafter OCFS), which is the state agency with oversight of all social service agencies in New York State. It is Monroe County DHS's *choice* to hold this training several times each year, in the 10-week format it has selected. It is not a program set up specifically to be taught in only this fashion, as other options for training, including on-line and "mini-MAPP" training options are offered by OCFS.

Monroe County DHS also takes the position that there is nothing preventing Ms. K. from undergoing the MAPP training and thereafter submitting for certification as a foster care parent, but that its obligation is limited to certification *only after completion of MAPP training*. DHS argues that since Ms. K. has not completed the MAPP program, she cannot be certified as a foster care parent.

## Decision

Having a 10-week MAPP training program is also not a reason to find potential caregivers "not qualified" under section 1017 (2) (a) (iii). If the statute was intended to mean that a qualified resource is already a certified foster care parent, it simply would have said so. It does not. The statute was clearly intended to allow expedited foster care status to a resource person found fit by the relevant department of social services

---

* DHS states, in paragraph 17 of its response, that New York State encourages MAPP training for foster care parents, and this is true. The Office of Children and Family Services does indeed encourage MAPP training, but it is *not* a requirement for certification as a foster care parent, according to the Office of Children and Family Services' regulations as shown on its Web site. This is contrary to counsel's statement that it is required by New York State.

to take care of the child or children needing such care. This court reads the statute very plainly, and understands that if the identified potential resource/caregiver is qualified to take care of the child, that person *shall be certified as an emergency foster parent.* This is not a permissive statute. It is plainly directive in nature. Thus, this court can direct that a department of social services follow the law and thus certify emergency kinship foster care homes generally.

This leads to the second issue: whether Ms. K. is qualified to be certified as an emergency kinship foster parent. Here, the home of a nonrelative resource caregiver was located even before the application for removal was filed with the court. Clearly, DHS had investigated this home, and determined it an appropriate placement for Jermaine. The caseworker herself took the child to Ms. K., and the child has remained there ever since. Again, no objection or concern has been raised about Ms. K. or the care she is providing to Jermaine.

The regulations referenced in Family Court Act § 1017 (2) (a) (iii) above are in Official Compilation of Codes, Rules and Regulations of the State of New York, title 18, chapter II, subchapter C, article 3, part 443, which establishes the rules any commissioner of a department of human services, and its agents, must follow in certifying foster home care. In 18 NYCRR 443.1 (h) a certified emergency foster home is a home in which foster care is provided for a child placed with an authorized agency, who is cared for 24 hours a day in a family home with a foster parent who is either a relative other than one who is within the second or third degree to the parent of the child, or is a nonrelative with a significant prior relationship with the child's family and who is duly certified by an authorized agency in accordance with section 443.7 of these same regulations.

Here, the nonrelative resource, Ms. K., is the paternal aunt of this subject child's half-sibling. This half-sibling has resided in the home of Ms. K., along with another half-sibling, so Jermaine was placed in a home where he is being cared for 24 hours a day by a person who has a significant prior relationship with the child's family. DHS placed the child there, so it is clear the caseworkers feel this is a safe and appropriate home, i.e., "qualified"—in which Jermaine will be well cared for, and has already been well cared for. DHS has provided no objection to the care the child is receiving, nor has it proffered any objections or concerns about the home of Ms. K. No objections or concerns have been advanced about Ms. K. herself, nor about

her circumstances such that this is not a good placement option for Jermaine. Therefore, the requirements under 18 NYCRR 443.1 seem satisfied by DHS placing the child in the home of Ms. K.

18 NYCRR 443.7, the regulation regarding certification of an emergency foster home, states that a potential foster home may be certified as an emergency foster home under certain circumstances, and in subdivision (b) states that DHS *must* perform certain tasks, such as obtain statements from the potential foster care parent, perform a home study on an expedited basis, explaining the role of DHS and the supervision that is required, obtaining character references, and check DHS agency records. This is the complete list of tasks DHS must perform, and upon completion of these tasks, if the home is found suitable, *it will be certified or approved as an emergency foster home for 90 days from the date of placement*. There is no language requiring the completion of the MAPP program or any other program as a prerequisite for foster care certification.

Clearly, a home study was done, an agency check was completed, statements were obtained from the potential caregiver and the supervisory role of DHS was explained to the caregiver, or this child would not have been placed with Ms. K. DHS has not argued that it has not taken steps required by it and thus does not have to certify Ms. K. as an emergency kinship foster care home.

DHS cites no authority to support its position that it may ignore or otherwise disregard statutory, and opt out of regulatory, authority. DHS has had ample opportunity to explain its position and provide the authority, yet none has been forthcoming. This court is troubled by the position of Monroe County DHS that it is able to "opt out" of certain regulations, when the plain language of the applicable statutes and regulations is not permissive, but uses the terms "shall" for both the directives the court must apply, and the requirements of the regulations DHS must follow.

The third issue is whether the court can order DHS to pay the appropriate foster care funds to Ms. K., which would be paid if she were a stranger foster care provider caring for the child. The answer is, yes, it can.

This child should not have to risk being removed from a loving, familiar home where he resides with two half-siblings, only to potentially be placed with stranger foster care, due to a lack of funding for Ms. K. If Ms. K. were a certified foster care

provider with MAPP training or an emergency kinship foster care home, she must be paid for providing foster care. The whole statutory scheme and regulations cannot be ignored, in an effort to save the County of Monroe money or otherwise. This child deserves what is normally provided by foster care, and nothing less will satisfy this court in terms of the efforts expended by DHS on behalf of this child.

Therefore, this court is directing DHS to certify Ms. K. as an emergency kinship foster care home, effective September 10, 2009, and to pay her as it would any foster care provider who had taken the MAPP course and was taking care of Jermaine.

Now therefore, it is ordered, that the Department of Human Services shall certify Loretta K. as a kinship foster care parent and her home as a kinship foster home, effective September 10, 2009, and shall pay on an ongoing basis all fees and monies a foster care parent is entitled to, in compliance with Family Court Act § 1017 (2) (a) (iii) and 18 NYCRR 443.7 (h); and it is further ordered, that Loretta K. shall be paid for any costs, monies and fees she is entitled to as a certified foster care home, back to the effective date of September 10, 2009; and it is further ordered, that the current DHS caseworker assigned to this matter shall meet with and assist Ms. K. in obtaining training as suggested by the OCFS, including MAPP training if possible, within the next seven days, and shall report back to the court and all counsel, in writing, which training opportunities Ms. K. was presented with, as well as the steps the caseworker took to ensure the completion of said training within the next 90 days; and it is further ordered, that the current court order regarding Jermaine H. is hereby modified to reflect that he is in a kinship foster care placement, effective September 10, 2009.